IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

FREDRICK J. FARMER, D.O. )
 )
     Plaintiff, )
vs. ) Case No. 6:17-CV-01284-EFM-JPO
 )
STAFFORD COUNTY HOSPITAL, )
RICHARD S. CARTER, M.D., )
CARTER PROFESSIONAL CARE )
STAFFORD, LLC; and )
TODD TAYLOR, )
     Defendants. )
_____ )

## PLAINTIFF'S RESPONSE TO DEFENDANTS STAFFORD COUNTY HOSPITAL AND TODD TAYLOR'S FED. R. CIV. P. 12(b)(1) MOTION TO DISMISS

  In their Fed. R. Civ. P. 12(b)(1) motion to dismiss, Defendants Stafford County Hospital and Todd Taylor (collectively, "the Hospital and Taylor") seek dismissal of certain state-law tort claims asserted against them based on Dr. Farmer's purported failure to meet K.S.A. 12-105b(d)'s notice requirement. As shown below, the Hospital and Taylor's dismissal request is unfounded and should be rejected. Dr. Farmer did not have to satisfy K.S.A 12-105b(d)'s notice requirement because of the exigent circumstances in this case and the fact that the primary relief that he has sought is equitable. Accordingly, the state-law tort claims challenged by the Hospital and Taylor should not be dismissed.

### Background

  Dr. Farmer has long been a member of the Medical Staff at the Hospital. (State Court Petition, Dkt. No. 1-1 at ¶¶ 9-10). Toward the end of 2016, the Hospital and Carter Professional Care Stafford, LLC ("the Management Company") entered into a contract giving the Management Company managerial control of the Hospital. (*Id.* at ¶ 3). Shortly thereafter, Dr. Farmer began

complaining about how the Management Company and its sole owner, Dr. Richard Carter, were running the Hospital to, among others, the Stafford County Commissioners. (*Id.* at ¶ 28). Dr. Carter was aware of Dr. Farmer's complaints. (*Id.*).

On July 22, 2017, Dr. Farmer received a letter from the Hospital's administrator, Taylor, informing him that a so called independent peer review firm had made adverse standard of care findings for two of Dr. Farmer's charts, that the adverse findings had been reviewed and accepted by the Risk Management Committee, and that the Hospital had forwarded the adverse findings to the Kansas Board of Healing Arts ("KBOHA"). (*Id.* at ¶ 24). This was the first notice Dr. Farmer received of any allegations that he had failed to meet the relevant standard of care, even though many of the allegations that purportedly served as the bases for the adverse findings occurred in October/November 2016, (*id.* at ¶¶ 24 & 26), and Dr. Farmer was a member of the Hospital's Risk Management Committee, (*id.* at. ¶¶ 21-23). Taylor's letter also indicated that Dr. Farmer would not be given a hearing to challenge the adverse findings before the Hospital's Board of Directors acted on them; instead, Dr. Farmer would only be able to submit a statement to the so-called independent peer review firm for it to review, (*id.* at ¶ 24), a process inconsistent with the one established by the Properly Enact Medical Staff Bylaws ("Properly Enacted Bylaws"), (*id* at ¶¶ 11-12).[1]

Immediately after receiving Taylor's letter, Dr. Farmer sent Defendants a written correspondence requesting that Defendants withdraw the unfounded adverse findings that they had

---

[1] Approximately one month before Dr. Farmer received Taylor's letter, Defendants attempted to amend the Properly Enacted Bylaws to comport with the process to which they were attempting to subject Dr. Farmer. (*Id.* at ¶¶ 13-14). This attempted amendment was ineffectual, though, because the Medical Staff did not vote on the proposed Medical Staff Bylaws prior to the Hospital's Board of Directors taking up the matter. (*Id.* at ¶ 14).

forwarded to the KBOHA, grant him a hearing, and produce all related documents, including the reports and records made during the alleged peer review. (*Id.* at ¶ 26; *see also* July 28 correspondence, attached hereto as Exhibit 1). Defendants, however, rejected all of Dr. Farmer's requests. (State Court Petition, Dkt. No. 1-1 at ¶ 27).

Realizing that Defendants had no intention of rectifying their wrongs, and fearing that the train Defendants had set in motion was going to continue full steam ahead, Dr. Farmer filed suit in state court on October 16, 2017, seeking immediate equitable relief and ultimately damages, asserting the following claims: (1) breach of contract, (2) tortious interference—existing contractual relations, (3) promissory estoppel and detrimental reliance, (4) defamation and injury to privacy interests (5) retaliation, (6) violation of free speech, and (7) violations of procedural due process rights. (*See generally* State Court Petition, Dkt. No. 1-1). In support of the Petition's prayer for equitable relief, Dr. Farmer filed an Application for Temporary Injunction, (*see* Exhibit 2, attached hereto), along with a memorandum in support, (*see* Exhibit 3, attached hereto), and declaration from Dr. Farmer, (*see* Exhibit 4, attached hereto). A hearing on Dr. Farmer's application was set for November 14, 2017. (*see* Exhibit 5, attached hereto). But just prior to the hearing Defendants removed Dr. Farmer's suit to federal court based on federal-question jurisdiction. (*See generally* Notice of Removal, Dkt. No. 1).

Following Defendants' removal, Dr. Farmer filed a Motion for Temporary Restraining Order in federal court. (*See generally* Motion for Temporary Restraining Order, Dkt. No. 5). As stated in Dr. Farmer's motion, such relief was necessary because Defendants had indicated to Dr. Farmer that they "intend[ed] to take an adverse action against [his] credentials at the Hospital" without first affording Dr. Farmer the due process to which he was entitled or the documents

necessary for him to rebut the allegations lodged against him. (*Id.* at ¶ 6). The day after Dr. Farmer

filed his motion, this Court held a hearing on it. (*See* Temporary Restraining Order, Dkt. No. 10).

Ultimately, this Court granted Dr. Farmer's request. (*See generally id.*). Specifically, the

Court found that, to the extent Dr. Farmer sought to enjoin Defendants "from taking any further

adverse action against his privileges at Stafford County Hospital or his medical license until he is

given notice and an opportunity to be heard and present evidence before the Stafford County

Hospital Credentials Committees pursuant to the Stafford County Medical Staff Bylaws," the

requirements for a temporary restraining order under Fed. R. Civ. P. 65(b) had been satisfied. (*Id.*

at 1). Accordingly, the Court enjoined Defendants from:

> taking any further adverse action against Plaintiff's privileges at Stafford County
> Hospital, whether styled as a renewal of privileges, a review of standard of care, or
> otherwise, and from taking any additional action adversely impacting Plaintiff's
> medical license, until after Plaintiff is given notice and an opportunity to appear
> and present evidence before the Stafford County Hospital Medical Staff Credentials
> Committee pursuant to the Medical Staff Bylaws of Stafford County Hospital.

(*Id.* at 2).

In addition to its written order, the Court also provided Defendants with the

following guidance regarding the scope of its order at the TRO hearing.

```
           11-14-17  FARMER v. STAFFORD  No. 17-1284        66

10:16:17   1        MR. AYERS:  Your Honor, could you include in that

10:16:19   2   injunction that they not act on the renewal of his

10:16:22   3   privileges pending some rights --

10:16:26   4        THE COURT:  That would seem to me to be a

10:16:27   5   back-door way to get around what I'm trying to avoid them
```

4

```
10:16:30   6  doing.  So I would agree that if they can't act on his
10:16:36   7  credentialing, they can't decide to nonrenew -- are his
10:16:39   8  privileges, in fact, up?
10:16:40   9      MR. AYERS:  In January.  But they gave him no
10:16:45  10  notice.
10:16:45  11      THE COURT:  Right.  Well, that's clearly a
10:16:47  12  back-door way to avoid my order, so I'm going to do that
10:16:50  13  as well.
```

Despite the clarity of this Court's instructions, Defendants did not abide by them. A mere six days after the Court's TRO was entered, Defendants told Dr. Farmer, for the first time, that his privileges had expired on September 30, 2017, that he currently had only temporary ones, and that a reappointment application needed to be completed immediately. (Farmer correspondence dated November 20, 2017, attached hereto as Exhibit 6). Shocked by this contention, Dr. Farmer immediately contacted Defendants, informing them that their newly-asserted position put them in violation of this Court's TRO. (*Id.*). In response, Defendants' prior counsel represented that the change in Dr. Farmer's privileges status was merely a clarification and would not otherwise affect Dr. Farmer. (*See* Defendants correspondence dated November 20, 2017, attached hereto as Exhibit 7). In light of this, the fact that Article IV, Section D, paragraph 10 of the Properly Enacted Medical Staff Bylaws allowed for temporary privileges, and the belief that Defendants would make a good-faith effort to comply with the Court's order, Dr. Farmer did not push the issue, opting instead to focus on reaching an agreement to settle the parties' dispute.

Unfortunately, as Dr. Farmer found out in February 2018, Defendants had persisted in taking steps designed to strip Dr. Farmer of his privileges and to damage his medical license. In a

letter dated February 6, 2018, Defendants notified Dr. Farmer that they had sent a new matter regarding his delivery of care to a third-party reviewer two days after the Court entered its TRO. (*See* Exhibit 8, attached hereto). Defendants defended their action on the ground that they believed it was mandated by the Hospital's Risk Management Plan. (*Id.*). While Defendants indicated in their February 6 correspondence that they had yet to send the matter to KBOHA, they stated that they intended for it to be taken up in the next thirty days by the Hospital's Risk Management Committee, who would determine what to do with the finding. (*Id.*). In their correspondence, Defendants did not identify, much less produce any information related to, the new matter that they forwarded to the third-party peer reviewer. Had the parties not been able to reach an agreement on how they would interact going forward, which they were able to do, (*see* Joint Motion to Dissolve the TRO, Dkt. No. 33), Dr. Farmer intended to file a civil contempt motion based on Defendants' conduct following this Court's issuance of its TRO, (*see* February 12, 2018 email, attached hereto as Exhibit 9).

On top of forwarding a new matter to a third-party peer reviewer, Defendants also maintained throughout this litigation that Dr. Farmer was not entitled to documents that allegedly served as the basis for the adverse findings that had purportedly been made against him. (*See* Scheduling Order, Dkt. No. 43 at 2-3 (discussing the documents that Defendants had been refusing to provide Dr. Farmer); *see also generally* Joint Motion Regarding Discovery, Dkt. No. 45). However, Magistrate Judge O"Hara recently disabused Defendants of the notion that they could refuse to provide documents that were relevant and necessary for Dr. Farmer to defeat the scurrilous allegations made against him by ordering such documents be produced. (*See* Order Regarding Joint Motion, Dkt. No. 53).

6

**Standard of Review**

"Motions to dismiss for lack of subject matter jurisdiction generally take one or two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to the subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based." *City of Albuquerque v. U.S. Dep't of Interior*, 379 F. 3d 901, 906 (10th Cir. 2004) (internal quotation marks omitted). When a defendant offers exhibits in support of its 12(b)(1) motion, like the Hospital and Taylor have done, courts view such a motion as raising a factual challenge. *See Shipley v. I.R.S.*, No. 04-2573, 2005 WL 1334617, at *1 (D. Kan. June 6, 2005). When deciding a factual challenge, courts may consider evidence outside of the pleading without converting the 12(b)(1) motion into a motion for summary judgment, so long as the jurisdictional question is not intertwined with the merits of the case, which is the case here. *See id.*

**Analysis**

There is no question that had Dr. Farmer not filed his lawsuit and sought the equitable relief when he did, Defendants would have irreparably harmed him. The Court's TRO, as well as Defendants' actions immediately before and after the issuance of that TRO, confirm this much. The question raised by the Hospital and Taylor's 12(b)(1) motion, and which is now before this Court, is whether a municipal entity and its employees, through their own misconduct, can force a plaintiff to immediately file suit in order to protect his rights and then cry foul when the plaintiff does not strictly comply with all of K.S.A. 12-105b's requirements. As shown below, the answer to this question is a resounding no, as to interpret K.S.A. 12-105b in such a way would create a Hobson Choice for injured Kansans: immediately seek equitable relief to prevent further injury and potentially lose other theories of recovery due to the possible application of a preclusion

doctrine or sit by idly, allow further injury to occur, and then seek relief after all of K.S.A. 12-105b's requirements have been satisfied.

With that said, if the Court disagrees and finds that K.S.A. 12-105b does apply, K.S.A. 12-105b should have little impact in this case because many of Dr. Farmer's claims and theories of relief do not fall within its grasp.

## I.   K.S.A. 12-105b does not apply in this case.

When interpreting a statute, courts are to avoid "absurd results . . . if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). In other words, "unreasonable results [should be avoided] whenever possible." *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982). K.S.A. 12-105b(d) provides, in relevant part:

> Any person having a claim against a municipality or against an employee of a municipality which could give rise to an action brought under the Kansas tort claims act shall file a written notice as provided in this subsection before commencing such action. The notice shall be filed with the clerk or governing body of the municipality and shall contain the following: (1) The name and address of the claimant and the name and address of the claimant's attorney, if any; (2) a concise statement of the factual basis of the claim, including the date, time, place and circumstances of the act, omission or event complained of; (3) the name and address of any public officer or employee involved, if known; (4) a concise statement of the nature and the extent of the injury claimed to have been suffered; and (5) a statement of the amount of monetary damages that is being requested. In the filing of a notice of claim, substantial compliance with the provisions and requirements of this subsection shall constitute valid filing of a claim. The contents of such notice shall not be admissible in any subsequent action arising out of the claim. Once notice of the claim is filed, no action shall be commenced until after the claimant has received notice from the municipality that it has denied the claim or until after 120 days has passed following the filing of the notice of claim, whichever occurs first. A claim is deemed denied if the municipality fails to approve the claim in its entirety within 120 days unless the interested parties have reached a settlement before the expiration of that period.

"The legislative intent of K.S.A. 12-105b is to insure that a municipality is made aware of a claim against it and that the municipality has ample time to investigate the claim before being sued on that claim." *Smith v. Kennedy*, 26 Kan. App. 2d 351, 361 (1999). As the Hospital and Taylor correctly concede in their motion, K.S.A. 12-105b(d)'s notice requirement is not intended to apply in every situation; in fact, there are many situations in which it does not. For instance, the requirement does not apply to claims brought against defendants who are not municipalities or employees thereof, claims based on law other than state tort law, and claims that seek injunctive or equitable relief.

No Kansas court has apparently addressed how K.S.A. 12-105b's notice requirement is to apply in a case such as this, where: (1) some defendants potentially qualify for K.S.A. 12-105b protection, but others clearly do not; (2) some claims are based on Kansas tort law, but others are not; and (3) both injunctive relief and damages are sought and the injunctive relief predominates. In similar situations, however, other courts have addressed whether a state's notice-of-claim requirement applied and have concluded that it does not. For instance, in *People United for Children, Inc. v. City of N.Y.*, 108 F. Supp. 2d 275 (S.D.N.Y. 2000), the plaintiffs asserted a host of federal and state-law claims against a number of different defendants seeking declaratory, injunctive, and monetary relief. Regarding the plaintiffs' state-law claims, the defendants sought to have them dismissed based on the plaintiffs' failure to comply with New York's notice of claims statute. 108 F. Supp. 2d at 301. Citing to the fact that "New York courts have recognized that the notice-of-claims statute does not apply where the primary relief being sought is equitable in nature, and monetary damages are only incidental," the court rejected the defendants' request. *Id.* The court noted that, while "[i]t [wa]s true that plaintiffs also s[ought] nominal and compensatory

9

damages, . . . . this request for relief [wa]s clearly incidental to the primary purpose of plaintiffs' action, which is to stop defendants from engaging in the challenged practices." *Id.*

Similarly, in *Calderon v. Barbarino*, No. 12-05819, 2013 WL 12176842 (N.D. Cal. May 2, 2013), the plaintiffs asserted a number of federal and state-law claims against the City of Saint Helena ("the City") and a number of non-city actors seeking "compensatory, punitive, and statutory damages as well as a declaration that the City violated the [California Health & Safety Code] and an injunction [enjoining] further unlawful practices." Believing that the plaintiffs' failure to comply with California's notice of claim statute barred the state-law claims against it, the City sought dismissal of such claims. 2013 WL 12176842, at *6. As was the case in *People United*, the court rejected the City's request. Specifically, the court stated that, "[w]hile plaintiffs do seek damages, their request for a declaration of past violation and an injunction of future conduct is 'of great weight and not just ancillary to the request for damages,'" and, therefore, dismissal was not warranted. *Id.* at *6 (quoting *Indep. Housing Servs. of S.F. v. Fillmore Center Ass'n*, 840 F. Supp. 1328, 1358 (N.D. Cal. 1993)).

*Floyd v. City of Butte*, 147 Mont. 305 (1966), is also instructive. There, the plaintiffs, owners of an apartment complex, were injured by the defendant's improper maintenance of an underground sewer line. *Id.* at 307. Due to the nature of the harm, the plaintiffs' injury threatened to be a continuing one if the defendant was not ordered to remedy the problem. *Id.* Eventually, the plaintiffs brought suit, alleging two state-law causes of action (nuisance and negligence) and seeking injunctive relief and "incidental damages for past harm." 147 Mont. at 307-08. Among other things, the defendant argued that the plaintiffs' claims should be dismissed because the plaintiffs had failed to comply with Montana's notice-of-claim statute. *Id.* at 309. The Montana

Supreme Court disagreed with this contention. *Id.* The Montana Supreme Court began its analysis by distinguishing *Floyd* from other cases where notice had been required by noting that the injury in *Floyd* was "not an ordinary injur[y] [that is] definite in time and place," which is the type of injury for which the legislature intended the notice requirement to apply, but, rather, was one that was "not capable of being captured by a definition of time and place of injury." The court rejected the defendant's apparent insinuation that the notice requirement should nevertheless be applied because the plaintiffs were seeking incidental damages, stating that such damages were "purely incidental to the equitable relief prayed for." *Id.* at 313.

*People United*, *Calderon*, and *Floyd* should be followed here. Allowing a municipality and/or its employees to engage in continued misconduct and then hide behind K.S.A. 12-105b when the injured party files suit to prevent further injury does not advance the purpose behind the statute. Cases like this one are fundamentally different than the ones envisioned by the Kansas legislature—*i.e.*, cases where a party, possibly unbeknownst to a municipality and/or its employees, is injured at one particular time, and, at some later point, springs a lawsuit upon the unsuspecting municipality and/or its employees. Here, Dr. Farmer repeatedly notified the Hospital and Taylor of their improper conduct and requested that they remedy it. Dr. Farmer also specifically told the Hospital and Taylor that he would take the "necessary steps to protect his livelihood and reputation" if they did not cease engaging in such conduct. (*See* July 28 correspondence, attached hereto as Exhibit 1). However, despite Dr. Farmer's efforts, the Hospital and Taylor, as well as others, continued to violate Dr. Farmer's constitutional, statutory, common-law, and contractual rights. Thus, in a situation like this, there is no justification for requiring the plaintiff to give K.S.A. 12-105b notice because the defendants covered by K.S.A. 12-105b are

already well aware of the bases of the plaintiff's claims and they have the ability to avoid litigation simply by ceasing their improper conduct.

Second, requiring plaintiffs like Dr. Farmer to give notice of their state-law tort claims to "K.S.A. 12-105b defendants" prior to asserting such claims along with their claims against "non-K.S.A. 12-105b defendants" potentially raises a claim preclusion problem. The reason for this is that "[i]f a plaintiff fails to present all grounds or theories for relief arising from [a] single wrong, [he] may not split the cause of action or claim by bringing a subsequent suit that alleges new theories." *Zhu v. St. Francis Health Center*, 413 F. Supp. 2d 1232, 1239 (D. Kan. 2006); *accord Rhoten v. Dickson*, 290 Kan. 92, 110 (2010) (stating that "a claim arising from the same transaction or series of connected transactions as a previous suit, which concluded in a valid and final judgment, will be precluded" (internal quotation marks omitted)); *see also Falls Stamping & Welding Co. v. Int'l United Auto Workers, Aerospace & Agr. Implement Workers of Am., Region II*, 744 F.2d 521, 525 (6th Cir. 1984) (recognizing that "[s]everal circuits have held that injunctive relief preclude later claims for damages on the same cause of action"). Therefore, in a case such as this, where the plaintiff's injuries and theories of recovery spawn from the same injurious conduct—namely, the deprivation of process and propagation of patently false information intended to injure Dr. Farmer based on his exercise of free speech, it is possible that a plaintiff like Dr. Farmer could be barred from seeking damages against a "K.S.A. 12-105b defendant" after litigating his request for injunctive relief against such defendant, as well as injunctive and legal relief against a "non-K.S.A. 12-105b defendant." *See Burnison v. Fry*, 199 Kan. 277, 281 (1967) (stating that, for preclusion purposes, "[a] cause of action on which a judgement is entered arises from the wrong done and not from the character of the relief sought," and, therefore, one suit that

seeks injunctive relief can be considered "identical" to a different one seeking damages so long as both suits stem from a common wrong). *But see Thompson-Hayward*, 8 Kan. App. 2d 487, 492 (1983) (stating that "an action for injunctive relief or specific performance does not constitute the same cause of action as an action for damages").[2]

To be sure, the Restatement (Second) of Judgments § 26(1)(c) states that claim preclusion may not apply when the first court lacked jurisdiction to hear the claims that are subsequently brought. Whether this portion of the Restatement (Second) has been adopted by Kansas courts, however, is not clear. *See Wright v. Barrett*, No. 96-2107, 1997 WL 728196, at *8 (D. Kan. Nov. 18, 1997) (noting that "[t]he courts of Kansas have neither adopted nor rejected" it). Assuming for the moment that it has been adopted, there are questions whether it would apply in this case. This is so, even though K.S.A. 12-105b has been described as jurisdictional, *see, e.g.*, *Sleeth v. Sedan City Hosp.*, 298 Kan. 853, Syl. ¶ 1 (2014), because, generally speaking, trial courts, both federal and state, have jurisdiction to hear state-law tort claims; it is only when the plaintiff does not provide adequate notice that a court's jurisdiction to hear such claims may be affected. Other courts have held that, when a plaintiff's actions are the cause of the first court's not having jurisdiction over a claim subsequently brought in another lawsuit, § 26(1)(c) does not apply. *See, e.g.*, *Staats v. Cnty of Sawyer*, 220 F.3d 511, 516 (7th Cir. 2000) ("[I]f there is a forum in which all claims arising out of the single transaction could have been brought, and the plaintiff chooses a forum of limited jurisdiction instead, then the plaintiff's other claims are barred by the doctrine of claim preclusion because the other claims *could have been brought* in the forum of general

---

[2]   As alluded to in *Bolden v. City of Topeka*, No. 02-2635, 2007 WL 2746683, at *5 (D. Kan. Sept. 19, 2007), it appears that the cited rule in *Thompson-Hayward Chem. Co.* applies in cases, unlike this one, "where plaintiff has previously sought *only* injunctive relief" (emphasis added)).

13

jurisdiction."). Accordingly, it is possible that a plaintiff's choice to immediately seek relief to avoid further injury, as opposed to waiting to bring an action until after the requirements of K.S.A. 12-105b have been satisfied, may not trigger the § 26(1)(c) exception to preclusion because it will be viewed as a choice that can be counted against him.

Finally, it is not clear whether amendment is possible to add a state-law tort claim to an already-filed suit once K.S.A. 12-105b's requirements have been satisfied. In *Gessner v. Phillips Cnty. Com'rs*, 270 Kan. 78, 81 (2000), the Kansas Supreme Court stated that the "clear legislative intent [behind K.S.A. 12-105b is] to disallow the commencement of *any actions* prior to the filing of the requisite notice." (Emphasis added). The Kansas Supreme Court reaffirmed this conclusion in *Sleeth v. Sedan City Hosp.*, 298 Kan. 853, 870 (2014), stating that K.S.A. 12-105b "prohibits initiating an action before the 120-day review period has expired." Counsel has not discovered a case in which a Kansas appellate court addressed whether the conclusions in *Gessner* and *Sleeth* affect a plaintiff's ability to amend an already-filed complaint or petition once K.S.A. 12-105b's requirements are met. Thus, it is not clear in light of existing precedent whether amendment is of any help to a plaintiff like Dr. Farmer.

In sum, this Court should not Pavlovianly apply K.S.A. 12-105b when deciding a case involving claims against both "K.S.A. 12-105b defendants" and "non-K.S.A. 12-105b defendants" that request equitable and legal relief, as such an approach would not further the purpose behind K.S.A. 12-105b and could lead to unreasonable results when an injured party takes immediate action to prevent further injury. Instead, the Court should follow the reasoned approach in *People United*, *Calderon*, and *Floyd* and base its determination of whether K.S.A. 12-105b applies on whether Dr. Farmer's action's primary purpose is to secure injunctive relief or monetary damages.

14

Here, it is clear the present suit was filed to obtain injunctive relief. The Court need not take just Dr. Farmer's word for it—rather, it can look at the record, which aptly supports Dr. Farmer's position. For instance, paragraph 27 of the state court petition states: "The Hospital has not rescinded its report to the Kansas Board of Healing Arts, nor has the Hospital been forthcoming with the documents requested by counsel, thus *necessitating the filing of this lawsuit to obtain Dr. Farmer's due process rights and protect his reputation*." (Emphasis added). The Petition's Prayer for Relief begins with a request for "temporary, preliminary, and permanent" injunctive relief, and only incidentally requests damages and "further relief." Furthermore, in support of his state court petition, Dr. Farmer immediately filed a request in state court seeking a temporary injunction. Once the case was removed to federal court, Dr. Farmer followed up his earlier request with a request for a temporary restraining order. Thus, while it is true that Dr. Farmer's state court petition also seeks legal relief, it is clear that the primary reason that Dr. Farmer brought his action, and did so when he did, is because he wanted injunctive relief.

What's more, Dr. Farmer's belief that immediate injunctive relief was necessary to protect his rights was not imaginary. First, shortly after removing this case to federal court, Defendants indicated that they intended to press forward with action against Dr. Farmer's privileges, despite the lawsuit that Dr. Farmer had filed. Second, finding that irreparable harm was likely to occur if Defendants were left to their own devices, this Court granted Dr. Farmer's request for a TRO. Third, despite the Court's TRO and its clear instructions on what Defendants could and could not do, Defendants forwarded additional false allegations to an outside peer reviewer and threatened to forward such allegations to the KBOHA. Fourth, throughout this litigation, Defendants have maintained the position that certain documents relevant and necessary for Dr. Farmer to defend

against the false and defamatory allegations that Defendants have lodged against him were not producible, despite having no legitimate basis for doing so, as shown by Judge O'Hara's discovery order on the matter. Accordingly, it is clear that Dr. Farmer's decision to file when he did, as opposed to waiting around until the K.S.A. 12-105b's requirements could be satisfied, was not only reasonable, but was necessary. As a result, this Court should find that K.S.A. 12-105b does not apply in this case and should deny the Hospital and Taylor's 12(b)(1) motion to dismiss.

II.    **Even if this Court finds that K.S.A. 12-105b does apply in this case, its effect is limited because many of Dr. Farmer's claims do not fall within the statute's purview.**

As the Hospital and Taylor correctly concede, Claims I, II, III are not subject to their 12(b)(1) motion because they either do not assert tort-based claims or are asserted against defendants that clearly are not covered by K.S.A. 12-105b. (Motion to Dismiss, Dkt. No. 52 at 5-6). With respect to Claim VII, it only asserts a federal claim against the Hospital and Taylor. Accordingly, it too is not subject to the Hospital and Taylor's 12(b)(1) motion to dismiss. *See, e.g.*, *Trammell v. Denning*, No. 12-3152, 2013 WL 50211, at *2 (D. Kan. Jan. 3, 2013) (stating that "K.S.A. 12-105b does not apply to federal claims").

Regarding Claim VI, it relies on both a state-tort law theory as well as a federal-law theory. Therefore, if the Court finds that K.S.A. 12-105b applies in this case, then only the state-law theory for Claim VI should be dismissed. Additionally, if the Court finds that K.S.A. 12-105b applies in this case, then Claims IV and V, to the extent they are asserted against the Hospital and Taylor, should be dismissed, as they too are based on state-tort law.

In sum, if this Court finds that K.S.A. 12-105b applies in this case, which it should not, only a couple of claims will be affected, namely, Claims IV, V, and VI, and only to the extent they

are asserted against the Hospital and Taylor. In other words, the Hospital and Taylor's motion does not touch Claims I, II, III, and VII at all, nor does it affect Claims IV and V to the extent that they are asserted against Dr. Richard Carter or Carter Professional Care Stafford, LLC.

### Conclusion

Due to the exigency of the circumstances in this case, as well as the fact that Dr. Farmer was primarily seeking injunctive relief, K.S.A 12-105b should not be found to be applicable here. Accordingly, the Hospital and Taylor's 12(b)(1) motion to dismiss should be denied. With that said, if the Court disagrees and in fact applies K.S.A. 12-105b in this case, the statute's affect in this case is limited, as only a few of Dr. Farmer's claim fall within its purview.

Respectfully submitted,

FOULSTON SIEFKIN LLP
1551 N. Waterfront Pkwy., Ste. 100
Wichita, KS 67206-4466


By:    /s /Gary L. Ayers
       Gary L. Ayers, S. Ct. No. 10345
       gayers@foulston.com
       Dir. Tel.:  316.291.9530
       Clayton J. Kaiser, S. Ct. No. 24066
       ckaiser@foulston.com
       Dir. Tel.: 316.291.9539

*ATTORNEYS FOR PLAINTIFF*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 17, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record.

By:_____/s /Gary L. Ayers_____

Gary L. Ayers, S. Ct. No. 10345

# FOULSTON [] SIEFKIN LLP

**ATTORNEYS AT LAW**

Topeka Tower, Suite 1400
534 South Kansas Ave.
Topeka, Kansas 66603-3436
785.233.3600
Fax 785.233.1610

**LexMundi**

Brooke Bennett Aziere
316.291.9768
866.346.1939 Fax
baziere@foulston.com

1551 N. Waterfront Parkway, Suite 100
Wichita, Kansas 67206-4466
316.267.6371
www.foulston.com

32 Corporate Woods, Suite 600
9225 Indian Creek Parkway
Overland Park, Kansas 66210-2000
913.498.2100
Fax 913.498.2101

DGGi
INDEPENDENT MEMBER

July 28, 2017

**SENT VIA FACSIMILE 620-234-5792; ORIGINAL TO FOLLOW BY MAIL**

*Personal & Confidential*

Mr. Todd Taylor
Stafford County Hospital
502 S. Buckeye
Stafford, Kansas 67578

Re:   Dr. Fritz Farmer
      Standard of Care Level III findings

Dear Mr. Taylor:

Foulston Siefkin LLP has been retained to represent Dr. Fritz Farmer related to the Standard of Care Level III findings referenced in your July 21, 2017 letter. This letter serves as our notice that Dr. Farmer intends to supply a written statement in response to the allegations stated in your July 21, 2017 letter. However, Dr. Farmer needs access to the review findings in order to be in a position to respond to the allegations as he explained to you on July 21, 2017. Your refusal underscores a separate agenda motivated by concerns other than quality of care. Produce those findings to my office no later than **5:00 p.m. on Monday, July 31, 2017**.

Additionally, the hospital's reporting of the unfounded Standard of Care Level III findings to the Kansas Board of Healing Arts ("KBHA") without first giving Dr. Farmer an opportunity to respond is a violation of his due process rights and the Medical Staff Bylaws (the "Bylaws") approved by the Medical Staff in 2009. The hospital's governing body cannot unilaterally amend the Bylaws as apparently it attempted to do in June 2017.

The hospital failed to provide notice in the method prescribed by the Bylaws. Article IV, Section H.2 of the Bylaws requires notice by certified mail, return receipt, which did not occur in this case. The notice also failed to notify Dr. Farmer of his right to fair hearing and how to make such a request for hearing. <u>This letter serves as Dr. Farmer's request to a hearing pursuant to Article IV, Section H.2 of the Bylaws.</u> Contrary to the statement in the unapproved June 2017 version of the Bylaws, the response of a peer review organization is not a replacement for a hearing.

Moreover, the peer review process outlined in the Bylaws was not followed. The Medical Staff Risk Management Committee (the "Committee") is responsible for investigating reportable



**EXHIBIT**
**1**

Mr. Todd Taylor
Stafford County Hospital
July 28, 2017
Page 2

incidents and determining whether applicable standards of care have been satisfied. Such findings are to be forwarded to the Risk Manager, who bears responsibility for filing quarterly reports with the Kansas Department of Health and Environment ("KDHE") and specific adverse findings with state licensing agencies. Dr. Farmer serves as the Risk Manager and serves on the Committee. The Committee met on January 17, 2017, and March 22, 2017. No concerns or issues were raised regarding Dr. Farmer's standard of care, which would have been expected as one of the alleged Standard of Care Level III cases occurred in November 2016. The first notice Dr. Farmer received was your letter dated July 21, 2017.

Dr. Farmer is not aware of any meetings of the Committee occurring after the March 22, 2017 meeting. If meetings were called in secret and he was the subject of review at those meetings, he should have been notified and provided with an opportunity to respond. The hospital's failure to do so reflects a malicious peer review process.

Dr. Farmer has been provided nothing to suggest that the Committee reviewed the cases as required in the Bylaws and pursuant to K.S.A. 65-4923(a)(2). This "process" is nothing more than a sham peer review motivated by hospital and management politics and retaliation. You have dredged up an old case from November 2016, a case where Dr. Farmer was not even the direct care provider, and a case from May 2017, in which Dr. Farmer spent nearly 40 minutes with the patient providing care and responding to his needs, in an attempt to manufacture two Level III findings. These acts are malicious and with bad faith. In so acting, the hospital has violated state law and the Health Care Quality Improvement Act.

Dr. Farmer demands that the hospital rectify the situation with KBHA immediately, providing notice that the report was prematurely filed before Dr. Farmer had an opportunity to respond and the investigation is ongoing. As noted above, the review findings need to be furnished to my office no later than **5:00 p.m. on Monday, July 31, 2017**. The Committee's agendas, minutes, notes, files, and other matters related to its review of the two cases and documenting its process need to be produced no later than **5:00 p.m. on Monday, July 31, 2017**. We also expect to receive acknowledgment of his request for hearing as set forth in the Bylaws.

Dr. Farmer will strive to provide a written statement by the requested August 4, 2017 deadline, however, given your refusal last week to provide him with pertinent information in which to respond, it will make it difficult and we fully expect you to grant Dr. Farmer an extension if requested. We will notify you on Thursday, August 3, 2017, if an extension is needed.

In the meantime, we urge the hospital to carefully review the findings setting aside politics, conflicts of interest, and retaliation with true attention to patient care. We believe that upon further contemplation the hospital will reach the appropriate decision and conclude that the Level III findings were erroneously assessed. If the hospital continues with these sham findings, Dr. Farmer will take the necessary steps to protect his reputation and livelihood.

Mr. Todd Taylor
Stafford County Hospital
July 28, 2017
Page 3

      If you have any questions, please contact me.  Do not attempt to contact Dr. Farmer to discuss this matter.

                    Very truly yours,

                    FOULSTON SIEFKIN LLP

                    Brooke Bennett Aziere

BBA/ce

cc:    Dr. Fritz Farmer

ELECTRONICALLY FILED
2017 Oct 20 PM 2:55
CLERK OF THE STAFFORD COUNTY DISTRICT COURT
CASE NUMBER:  2017-CV-000022

Gary L. Ayers
FOULSTON SIEFKIN LLP
1551 N. Waterfront Pkwy, Suite 100
Wichita, KS 67206
316.291.9530
gayers@foulston.com

## IN THE TWENTIETH JUDICIAL DISTRICT
## DISTRICT COURT, STAFFORD COUNTY, KANSAS

|  |  |
|---|---|
| **FREDRICK J. FARMER, D.O.** ) | |
| ) | |
| **Plaintiff,** ) | |
| **vs.** ) | **Case No. 2017-CV-22** |
| ) | |
| **STAFFORD COUNTY HOSPITAL,** ) | |
| **RICHARD S. CARTER, M.D.,** ) | |
| **CARTER PROFESSIONAL CARE** ) | |
| **STAFFORD, LLC; and TODD TAYLOR ,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

## APPLICATION FOR TEMPORARY INJUNCTION

COMES NOW the Plaintiff Fredrick J. Farmer, D.O. ("Dr. Farmer") and requests an order directing Defendants Stafford County Hospital ("the Hospital"), Richard S. Carter, M.D., Carter Professional Care Stafford, LLC, and Todd Taylor (collectively, "Defendants") to take the actions set forth below in order to restore the status quo that existed prior to Defendants breaching Dr. Farmer's constitutional, statutory, and contractual rights.   In support of this Application, Plaintiff incorporates the Petition and Supporting Declaration, Exhibit 1, attached hereto and incorporated herein, by reference, and states and alleges as follows:

EXHIBIT
**2**

1.      This case is based on Defendants' improper forwarding of unfounded findings to the Kansas Board of Healing Arts ("KBOHA") and refusal to provide the documents necessary for Dr. Farmer to challenge such findings.

2.      The Defendants' improper actions violate the Bylaws, Rules and Regulations of the Professional Staff that were properly enacted in 2013, the Hospital's Bylaws, Rules and Regulations, federal and state law, and the United States Constitution, which, collectively, establish a process that must be followed before actions like those in this case are taken.

3.      As a result of Defendants' improper actions, Dr. Farmer has suffered irreparable harm.  Not only has Dr. Farmer's personal and professional reputation been damaged, but his ability to practice medicine has been threatened.  For this, temporary injunctive relief may issue.

WHEREFORE, Dr. Farmer respectfully requests an order restoring the status quo pending resolution of this case by directing Defendants to immediately rescind and withdraw from the KBOHA Defendants' improperly submitted findings and to provide medical records involved in the so called independent peer review firm's findings, copies of all of the documents reviewed and created by the so called independent peer review firm, documents relied on by the Risk Management Committee ("the Committee") in reaching its conclusions, the so called independent peer review firm's findings, and the Committee's agendas, minutes, notes, and files related to when such findings were discussed.

FURTHER, Dr. Farmer requests an order prohibiting Defendants from suspending his medical staff privileges and further violating his constitutional rights.

2

FURTHER, Dr. Farmer requests an order requiring Defendants to specifically perform the requirements of the Rules and Regulations of the Professional Staff that were properly enacted in 2013and to provide Dr. Farmer with his procedural due process rights.

FINALLY, Dr. Farmer requests an order prohibiting Defendants from altering or destroying any physical or electronic documents or records relating to or touching upon the issues raised in this case.

Respectfully submitted,

FOULSTON SIEFKIN LLP
1551 N. Waterfront Pkwy., Ste. 100
Wichita, KS 67206-4466
Dir. Tele: 316.291.9530/Fax: 866.346.1938

By:___/s/ Gary L. Ayers_____
    Gary L. Ayers, S. Ct. No. 10345
    gayers@foulston.com
    316.291.9530
    ___/s/ Clayton J. Kaiser_____
    Clayton J. Kaiser, S. Ct. No. 24066
    ckaiser@foulston.com
    316.291.9539

ATTORNEYS FOR PLAINTIFF

3

ELECTRONICALLY FILED
2017 Oct 20 PM 2:55
CLERK OF THE STAFFORD COUNTY DISTRICT COURT
CASE NUMBER:  2017-CV-000022

Gary L. Ayers
FOULSTON SIEFKIN LLP
1551 N. Waterfront Pkwy, Suite 100
Wichita, KS 67206
316.291.9530
gayers@foulston.com

## IN THE TWENTIETH JUDICIAL DISTRICT
## DISTRICT COURT, STAFFORD COUNTY, KANSAS

|  |  |  |
|---|---|---|
| **FREDRICK J. FARMER, D.O.** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **Case No. 2017-CV-22** |
| | ) | |
| **STAFFORD COUNTY HOSPITAL,** | ) | |
| **RICHARD S. CARTER, M.D.,** | ) | |
| **CARTER PROFESSIONAL CARE** | ) | |
| **STAFFORD, LLC; and TODD TAYLOR ,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM IN SUPPORT OF APPLICATION FOR TEMPORARY INJUNCTION

Plaintiff has filed a Petition and Application for Temporary Injunction pursuant to K.S.A. 60-905. This is an action to restore the status quo that existed prior to Defendants' violation of Plaintiff's constitutional, statutory, and contractual rights during the pendency of this case. Specifically, Plaintiff is seeking injunctive relief directing Defendants to immediately rescind and withdraw from the Kansas Board of Healing Arts ("KBOHA") Defendants' improperly submitted findings and to provide Plaintiff with the reports, records, and documents associated with such findings.

**EXHIBIT**

**3**

1

## FACTUAL BACKGROUND

The following summarizes the factual background, as set forth in the Petition:

1.      Plaintiff Fredrick J. Farmer, D.O. ("Dr. Farmer") is a resident of Stafford County, Kansas.

2.      Defendant Stafford County Hospital ("the Hospital") is a county hospital organized and operated pursuant to K.S.A. 19-4601 et seq., with its principal place of business at 502 South Buckeye Street, Stafford, Kansas 67578. The Hospital's resident agent is National Registered Agents, Inc. of Kansas ("the Hospital's Resident Agent"). The Hospital's Resident Agent's registered office address is 112 SW 7th Street, Suite 3C, Topeka, Kansas 66603.

3.      Defendant Carter Professional Care Stafford LLC ("the Management Company") is an Oklahoma limited liability company, with its principal place of business at 700 W. 15th Street, Suite 1, Edmond, Oklahoma 73013. The Management Company was organized in Oklahoma on October 12, 2016, and, on November 1, 2016, applied to do business in Kansas as a foreign limited liability company. The Management Company's resident agent is Rob Gale, Esq., with a registered office at 211 N. Main Street, Syracuse, Kansas 67878. In November 2016, the Management Company and the Hospital entered into an agreement giving the Management Company management control of the Hospital.

4.       Upon information and belief, Defendant Richard S. Carter, M.D. ("Dr. Carter") is a resident of Oklahoma. Dr. Carter is the sole owner and managing member of the Management Company.

5.      Todd S. Taylor ("Mr. Taylor") is the Chief Executive Officer or Administrator of the Hospital, and may be served at the Hospital, 1502 South Buckeye Street, Stafford, Kansas 67578, or at his residence, 114 N. Union Ave, Stafford, Kansas 67578.

6.      As described below, Defendants, acting alone and through the Hospital and the Management Company and their respective agents, have violated the Bylaws, Rules and Regulations of the Professional Staff that were properly enacted in 2013 ("the properly enacted Medical Staff Bylaws"), the Hospital's Bylaws, Rules and Regulations ("the Hospital's Bylaws"), federal and state law, and Dr. Farmer's constitutional rights by (A) denying Dr. Farmer his procedural due process hearing and appeal rights prior to reporting to the KBOHA adverse findings threatening Dr. Farmer's license; and by (B) reporting false and defamatory findings to the KBOHA, again threatening Dr. Farmer's license, in retaliation for Dr. Farmer's actions (i) in refusing to grant hospital privileges where there was no proper basis for granting privileges; and (ii) for Dr. Farmer's bringing his legitimate concerns regarding the Hospital to the Stafford County Commissioners.

7.      Since 1980, Dr. Farmer has been a licensed physician in the State of Kansas. During his nearly forty years of practice, Dr. Farmer has enjoyed an excellent reputation as a physician. Prior to the intentionally false adverse report described herein, Dr. Farmer had never had his medical privileges at any of the hospitals he had served suspended or revoked. Additionally, there had never been any derogatory information filed against him with the KBOHA.

8.      Many years ago, Dr. Farmer applied for and received medical privileges to practice at the Hospital, which Dr. Farmer has maintained through the current day. As a provider

with privileges to attend patients at the Hospital, Dr. Farmer reasonably relied upon the promises and representations contained in the properly enacted Medical Staff Bylaws, and by the earlier iterations of those Bylaws as they were properly amended from time to time.

9.      Among other things, the properly enacted Medical Staff Bylaws provide a procedural protocol to be followed when there is a report, investigation, or peer review finding that implicates a member of the Hospital's medical staff.

10.     Specifically, Article IV, Section H.1, of the properly enacted Medical Staff Bylaws states that:

> When any practitioner receives notice of a recommendation by the Credentials Committee that, if ratified by decision of the Board of Directors, will adversely affect his appointment to or status as a member of the Medical Staff or his exercise of clinical privileges, **he shall be entitled to a hearing before the Medical Staff**. If the recommendation to the Credentials Committee **following such hearing** is still adverse to the affected practitioner, he shall then be **entitled to an appellate review** by the Board of Directors before the Board of Directors makes a final decision on the matter.

(Emphasis added).

Section H.1. contains additional language requiring a hearing and appellate review prior to any final decision, in the event the Board acts without first receiving a recommendation from the Credentials Committee. Either way, the physician is entitled to a hearing and appellate review of the results of the hearing prior to any final decision by the Board of Directors.

Section H.1. also requires that "All hearings and appellate reviews shall be in accordance with the procedural safeguards set forth in Section H to assure that the affected practitioner is accorded **all rights to which he is entitled**." (Emphasis added).

4

Section H.2. requires the Administrator, in this case, Mr. Taylor, to give "prompt oral and written notice of an adverse recommendation or decision to any affected practitioner who is entitled to a hearing or an appellate review, by certified mail, return receipt requested."

Section H.3. provides a window of between 14 and 30 days for scheduling the required hearing. Importantly, "The notice of hearing **shall state in concise language the acts or omissions with which the practitioner is charged, a list specific representative of charts being questioned, and/or the other reasons for subject matter that was considered in making the adverse recommendation or decision**." (Emphasis added.)

Section H continues with other specific procedural safeguards, to which the Bylaws confirm Dr. Farmer "is entitled." In all, the procedural safeguards to which Dr. Farmer is entitled fill most of pages 6 through 11 of the Bylaws.

11.     As part of a bad faith conspiracy among Defendants to deny Dr. Farmer his procedural due process rights contained in the properly enacted Medical Staff Bylaws, on June 22, 2017, immediately prior to the malicious conduct described herein, the Hospital's Board of Directors ("the Board"), at the behest of the Management Company and Dr. Carter, attempted to amend the Medical Staff Bylaws unilaterally. Among other things, the Management Company and Dr. Carter sought to amend Article IV, Section H. Specifically, the Management Company and Dr. Carter wanted to radically transform a physician's right to a hearing before his peers by adding the following two sentences to a new Article IV, Section H.4:

> In the event there are not at least three voting members of the Medical Staff who are not subject to the adverse Board action then the response of the peer review organization shall be considered sufficient replacement for a hearing. The effected (sic) staff member shall submit a written plea to the Administrator for such peer review consideration and response.

12.     However, the unilateral attempt to amend was ineffectual.  Pursuant to Article XIII, Rule 39, of the properly enacted Medical Staff Bylaws, the medical staff bylaws may be amended only after notice is given at a regular or special meeting of the medical staff and two-thirds of the active medical staff vote in favor the amendment. Here, Article XIII's requirements were not satisfied, as the active medical staff, which includes Dr. Farmer, was not notified of, nor did it vote on, any proposed amendments to the properly enacted Medical Staff Bylaws. As a result, the Board's unilateral effort to amend the properly enacted Medical Staff Bylaws is *ultra vires* and any action based on the attempted amendment is also *ultra vires*.

13.     Pursuant to Article X, paragraph 7, of the properly enacted Medical Staff Bylaws, the Risk Management Committee ("the Committee") is responsible for investigating reportable incidents and determining whether applicable standards of care have been satisfied. Such findings are to be forwarded to the Risk Manager, who has the responsibility of filing quarterly reports with the Kansas Department of Health and Environment and specific adverse findings with state licensing agencies (like the KBOHA).

14.     Dr. Farmer serves on the Committee and as the Risk Manager.

15.     The Committee met on January 17, 2017, and March 22, 2017. At neither meeting were concerns or issues raised regarding Dr. Farmer's standard of care.

16.     Dr. Farmer is not aware of any meetings of the Committee occurring after the March 22, 2017, meeting.

17.     On July 22, 2017, Dr. Farmer received a letter from the Hospital's administrator, Mr. Taylor, dated one day prior ("the July 21 letter"). According to the July 21 letter, "an

6

independent peer review firm" had found Standard of Care Level III findings[a] (Standards of Care with Injury Occurring or Reasonably Probable) for two of Dr. Farmer's charts. The letter went on to say that the peer review findings were reviewed and accepted by the Committee and forwarded on to the KBOHA. It also advised Dr. Farmer that, if he wanted to submit a response for "further consideration by the independent peer review firm," he needed to do so by August 4, 2017. Prior to the July 21 letter, Dr. Farmer had not been made aware that adverse findings had been found against him, much less given an opportunity to contest them.

18.     Upon receiving Defendant Taylor's July 21 letter, Dr. Farmer contacted his counsel, who, on July 28, 2017, demanded of the Hospital that Dr. Farmer be afforded the due process rights to which, as the properly enacted Medical Staff Bylaws said, he is "entitled." In addition to pointing out the many procedural flaws in the Hospital's actions, Dr. Farmer's counsel requested a hearing pursuant to the properly enacted Medical Staff Bylaws, and demanded of Mr. Taylor that he provide the review findings and the Committee's agendas, minutes, notes, files and other matters related to its review of the two cases in question. Despite repeated follow-on requests, those review findings and other documents have never been provided to Dr. Farmer or his counsel, although a wholly inadequate summary (not the medical record or other documents requested) was belatedly provided by the Hospital's counsel.

19.     In Dr. Farmer's counsel's July 28, 2017, letter, Dr. Farmer's attorney also pointed out the defamatory falsehoods underlying the July 21 letter.

---

[a]Peer review findings are typically evaluated on a scale of I to IV, with Level IV being the most serious. K.A.R. 28-52-4 Standard-of-care determinations, implementing K.S.A. 65-4921(f) ("Reportable incident").

a. For example, the Hospital supposedly found Dr. Farmer failed to meet the standard of care for a patient seen eight months earlier by the Hospital's nurse practitioner where Dr. Farmer was not the provider (or the supervisor of a physician's assistant) (nurse practitioners act independently; physician assistants act under the supervision of a physician). The nurse practitioner was acting independently pursuant to her nurse practitioner's license, and the Hospital failed or refused to submit the nurse practitioner to "peer review" for her conduct, for which she, not Dr. Farmer, was independently responsible.

b. In a second example, interfering with Dr. Farmer's medical judgment as to medical necessity, a patient was admitted to the Hospital when Dr. Farmer was out of town by a practitioner who did not at the time have privileges to do so. On another occasion, following Dr. Farmer's nearly 40 minutes in the ER with a patient providing appropriate care, the Hospital claimed that Dr. Farmer had not "stabilized" the patient per EMTALA[b] requirements, which the Hospital knows or should know cannot be used to establish a standard of care or the violation of a standard of care.

20.     The Hospital has not rescinded its report to the KBOHA, nor has the Hospital been forthcoming with the documents requested by counsel, thus necessitating the filing of this lawsuit to obtain Dr. Farmer's due process rights and protect his reputation.

---

[b] The Emergency Medical Treatment and Labor Act, 42 U.S.C. 1395dd.

8

## ARGUMENT AND AUTHORITIES

The purpose of temporary injunctive relief is to preserve or restore the status quo pending the final determination of the controversy on its merits. *See Wichita Wire, Inc. v. Lenox,* 11 Kan. App. 2d 459, 461 (1986). Status quo is defined as "the last actual, peaceable, noncontested position of the parties which preceded the pending controversy." *U.S.D. No. 503 v. McKinney*, 236 Kan. 224, 227 (1984). To receive injunctive relief, the moving party must establish that there is a substantial likelihood of him prevailing on the merits. *Steffes v. City of Lawrence,* 284 Kan. 380, 394 (2007). Additionally, the movant must show that:

> (1) there is a reasonable probability of irreparable future injury to the movant; (2) an action at law will not provide an adequate remedy; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, would not be adverse to the public interest.

*Id.* at 395 (citation omitted). Here, the requirements for obtaining a temporary injunction are met, and, thus, injunctive relief is warranted.

## I.      There is a substantial likelihood that Plaintiff will prevail on the merits.

Pursuant to the properly enacted Medical Staff Bylaws, Dr. Farmer was entitled to notice and a hearing before the Medical Staff prior to Defendants' forwarding false, unchallenged allegations to the KBOHA. Additionally, under the properly enacted Medical Staff Bylaws, Dr. Farmer was entitled to receive sufficient information to adequately respond to any allegation lodged against him. On top of the protections afforded by the properly enacted Medical Staff Bylaws, state and federal law also establish procedural protections with regard to reports affecting medical staff privileges and licensing. For instance, state law establishes a particular

9

process that a medical care facility must follow when there is a reportable incident. *See* K.S.A. 65-4923. As for federal law, it requires that a reasonable effort be made to obtain the facts of a matter and that adequate notice and hearing procedures must be afforded to a physician involved in a professional review action. *See* 42 U.S.C. § 11112.

In this case, Defendants, motivated by a desire to retaliate against Dr. Farmer for, among other things, exercising his First Amendment rights, disregarded all of the procedural protections that Dr. Farmer was entitled to under the properly enacted Medical Staff Bylaws, as well as state and federal law. Not only did Defendants fail to give Dr. Farmer notice and a hearing before forwarding false and defamatory findings to the KBOHA, but they have also refused to provide Dr. Farmer with the charts, files, reports, and documents necessary to challenge the allegations against him. Additionally, Defendants ignored the protocol that the properly enacted Medical Staff Bylaws sets forth regarding the processing of reportable incidents, a protocol that comports with the requirements of K.S.A. 65-4923. In light of all of this, it is substantially likely that Dr. Farmer will succeed at trial.

Defendants' attempt to unilaterally amend the properly enacted Medical Staff Bylaws does not excuse their actions, as the attempt to amend was ultra vires. To be effective, an amendment requires that notice be given at a regular or special meeting of the Medical Staff and that two-thirds of the active Medical Staff vote in favor of the amendment. That process was not followed in this case, and, thus, Defendants' purported amendment is without effect.

## II.     Irreparable Harm.

In *Steffes v. City of Lawrence,* 284 Kan. 380 (2007), the Kansas Supreme Court took the opportunity to clarify its precedent regarding temporary injunctions. Specifically, the Court

stated that "certainty of irreparable harm rather than the mere probability of it . . . set[s] too high of a standard for parties seeking injunctions." *Steffes*, 284 Kan. at 395. Rather, "only a reasonable probability is necessary." *Id.*

Just as Defendants intended, their actions have injured, and will continue to injure, Dr. Farmer's property and liberty interests in his medical license and professional reputation. As Defendants know, whenever a doctor seeks new or renewed licensure, privileges at another hospital (or healthcare facility), participation with an insurance payor or panel and/or a HMO, and new employment, a physician must: (1) answer numerous questions concerning challenges to his past record of medical competency (regardless of their truth or accuracy); (2) self-report any challenges to his medical qualifications by prior employers, insurance payors and panels, HMOs, licensing agencies, and prior hospitals where he had privileges, employment and participation; and (3) authorize the release, from such prior employers, hospitals, insurance programs, HMOs and licensing authorities, any adverse information concerning his medical competency, regardless of its truth or accuracy.

In addition, Defendants have constructively limited Dr. Farmer's ability to practice medicine and attend patients at the Hospital;[c] and Defendants' actions will likely interfere with Dr. Farmer's relationship with his existing patients.

---

[c] Per counsel's agreement on or about August 23, 2017, Dr. Farmer agreed temporarily not to exercise his privileges and the Hospital agreed to not characterize Dr. Farmer's agreement as a suspension or take any other adverse action on his privileges. This was followed two weeks later by the Hospital's counsel's statement that a physician's assistant was attending a patient at the hospital under the supervision of Dr. Farmer and the Hospital's demand that *Dr. Farmer* transfer care of the patient, when, in fact, it seems the Hospital was confused as to whether a physician's assistant (ostensibly supervised by Dr. Farmer) or a nurse practitioner (acting independently) was attending a particular patient. All the while, the Hospital did not comply, and has not complied, with its obligation to provide medical charts and other peer review materials to Dr. Farmer.

III.    **An action at law will not provide an adequate remedy.**

The injury that Dr. Farmer is currently suffering as a result of Defendants' actions is incapable of calculation. *See, e.g.*, *AIG Risk Mgmt., Inc. v. Motel 6 Operating L.P.*, 960 S.W.2d 301, 309 (Tex. Ct. App. 1997) (stating that "an injured reputation cannot be readily restored with money"). First, it is impossible to know how many professional opportunities Dr. Farmer has already missed out on, and will continue to miss out on, due to the dissemination of false and defamatory information and the constructive limitation on his privileges at the hospital. Second, Defendants' unjustified actions have substantially disrupted Dr. Farmer's relationship with his existing patients. No amount of damages will adequately compensate Dr. Farmer for the impairment to his good name, which is nearly forty years in the making, or his doctor-patient relationships. Thus, this factor militates in favor of granting the requested relief.

IV.    **The Threatened Injury to Plaintiff Outweighs the Damages the Proposed Injunction May Cause Defendant.**

As noted above, Defendants' actions have already greatly injured Dr. Farmer, tarnishing his excellent reputation as a physician, constructively limiting his ability to practice medicine, and disrupting his relationship with existing patients. Forcing Defendants to withdraw the false and defamatory information that it submitted to the KBOHA, as well as follow the process set forth in the properly enacted Medical Staff Bylaws and applicable laws, will cause no damage to Defendants. As a result, this factor also favors the issuance of a temporary injunction.

V.    **An Injunction Is Not Adverse to the Public Interest.**

For nearly forty years, Dr. Farmer has been providing first-class patient care to Kansans. During that time, Dr. Farmer has never had his medical privileges at any of the hospitals he had served suspended or revoked. Additionally, prior to Defendants' unjustified actions in this case,

12

there had never been any derogatory information filed against him with the KBOHA. As is clear from Defendants' refusal to provide Dr. Farmer with the relevant charts, files, reports, and documents, the allegations forwarded to the KBOHA are unfounded and provide no basis for doubting Dr. Farmer's fitness to practice medicine. Thus, removing the constructive limitations that Defendants' actions have placed on Dr. Farmer's ability to serve patients in rural areas like Stafford County advances the public interest in Kansas.

## CONCLUSION

The requirements for injunctive relief are met in this case. Therefore, in order to restore the status quo that existed prior to Defendants' unfounded actions, Plaintiff respectfully requests that this Court order Defendants to immediately rescind and withdraw from the Kansas Board of Healing Arts ("KBOHA") Defendants' improperly submitted findings and to provide Plaintiff with the reports, records, and documents associated with such findings.

Respectfully submitted,

FOULSTON SIEFKIN LLP
1551 N. Waterfront Pkwy., Ste. 100
Wichita, KS 67206-4466
Dir. Tele: 316.291.9530/Fax: 866.346.1938

By:____/s/ Gary L. Ayers_____
 Gary L. Ayers, S. Ct. No. 10345
 gayers@foulston.com
 316.291.9530
 ___/s/ Clayton J. Kaiser_____
 Clayton J. Kaiser, S. Ct. No. 24066
 ckaiser@foulston.com
 316.291.9539

ATTORNEYS FOR PLAINTIFF

13

ELECTRONICALLY FILED
2017 Oct 20 PM 2:56
CLERK OF THE STAFFORD COUNTY DISTRICT COURT
CASE NUMBER: 2017-CV-000022

## IN THE TWENTIETH JUDICIAL DISTRICT
## DISTRICT COURT, STAFFORD COUNTY, KANSAS

| | |
|---|---|
| FREDRICK J. FARMER, D.O.<br><br>Plaintiff,<br><br>STAFFORD COUNTY HOSPITAL,<br>S. CARTER, M.D.,<br>CARTER PROFESSIONAL CARE<br>STAFFORD, LLC; and TODD TAYLOR ,<br><br>Defendants. | )<br>)<br>)<br>)        vs.<br>)    Case No. 2017-CV-22<br>)<br>) RICHARD<br>)<br>)<br>)<br>)<br>)<br>) |

### DECLARATION OF FREDRICK J. FARMER, D.O.

I, Fredrick J. Farmer, D.O., declare under penalty of perjury under the laws of the United States of America, as follows:

1.  I am the plaintiff in Case No. 2017-CV-22, *Farmer v. Stafford County Hospital, et al.*, Stafford County District Court, Stafford, Kansas.

2.  I have read the Petition and the Application for Temporary Injunction, and the factual statements contained therein are true to my best knowledge and belief.

3.  I was denied the due process rights to which I am entitled under the Stafford County Hospital Medical Staff Bylaws.

4.  The "peer review" findings submitted to the Kansas Board of Healing Arts ("KBOHA"), a summary of which was forwarded to my attorney by the lawyer for Stafford County Hospital, are based upon information that is not true. The Hospital's false report to the KBOHA is damaging to my reputation and poses an immediate threat to my medical license and to my relationship with my patients.

**EXHIBIT**

**4**

5.      I believe I am entitled to the relief set forth in the Petition and Application for

Temporary Injunction.

6.      Executed on the ___ day of October, 2017.

_____

Fredrick J. Farmer, D.O.

2

ELECTRONICALLY FILED
2017 Oct 20 PM 2:57
CLERK OF THE STAFFORD COUNTY DISTRICT COURT
CASE NUMBER:  2017-CV-000022

## IN THE TWENTIETH JUDICIAL DISTRICT
## DISTRICT COURT, STAFFORD COUNTY, KANSAS

| | |
|---|---|
| **FREDRICK J. FARMER, D.O.** ) | |
| ) | |
| **Plaintiff,** ) | |
| **vs.** ) | **Case No. 2017-CV-22** |
| ) | |
| **STAFFORD COUNTY HOSPITAL,** ) | |
| **RICHARD S. CARTER, M.D.,** ) | |
| **CARTER PROFESSIONAL CARE** ) | |
| **STAFFORD, LLC; and TODD TAYLOR ,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

### NOTICE OF HEARING

Please take note that the Hearing on Plaintiff's Application for Temporary Injunction will be heard before the Honorable Mike Keely, Chief Judge of the District Court for the Twentieth Judicial District, on **November 14, 2017, at 1:30 p.m.** in the **Stafford County Courthouse, 209 N. Broadway, St. John, Kansas** 67576-0365.

FOULSTON SIEFKIN LLP
1551 N. Waterfront Pkwy., Ste. 100
Wichita, KS 67206-4466
Dir. Tele: 316.291.9530/Fax: 866.346.1938


By:___/s/ Gary L. Ayers_____
    Gary L. Ayers, S. Ct. No. 10345
    gayers@foulston.com
    316.291.9530
    ___/s/ Clayton J. Kaiser_____
    Clayton J. Kaiser, S. Ct. No. 24066
    ckaiser@foulston.com
    316.291.9539

ATTORNEYS FOR PLAINTIFF

**EXHIBIT**
**5**



# FOULSTON **JF** SIEFKIN LLP

### ATTORNEYS AT LAW

Topeka Tower, Suite 1400
534 South Kansas Ave.
Topeka, Kansas 66603-3436
785.233.3600
Fax 785.233.1610

Member
**LexMundi**
World Ready

1551 N. Waterfront Parkway, Suite 100
Wichita, Kansas 67206-4466
316.267.6371
Fax 316.267.6345
www.foulston.com

32 Corporate Woods, Suite 600
9225 Indian Creek Parkway
Overland Park, Kansas 66210-2000
913.498.2100
Fax 913.498.2101

**GGi**
INDEPENDENT MEMBER

**WICHITA**
CHARLES J. WOODIN
MIKEL L. STOUT
STANLEY G. ANDEEL
DARRELL L. WARTA
HARVEY R. SORENSEN
JAMES M. ARMSTRONG
CHARLES P. EFFLANDT
GARY L. AYERS
LARRY G. RAPP
JAY F. FOWLER
CHRISTOPHER M. HURST
JIM H. GOERING
WYATT A. HOCH
AMY S. LEMLEY
DOUGLAS L. HANISCH
JEFFERY A. JORDAN

TRISHA A. THELEN
WILLIAM R. WOOD II
KEVIN J. ARNEL
CRAIG W. WEST
STEWART T. WEAVER
BOYD A. BYERS
DAVID E. ROGERS
TODD N. TEDESCO
HOLLY A. DYER
TIMOTHY P. O'SULLIVAN
DONALD D. BERNER
WILLIAM P. MATTHEWS
SHANNON D. WEAD
KARL N. HESSE
MICHAEL J. NORTON

PATRICIA VOTH BLANKENSHIP
ANDREW J. NOLAN
FORREST T. RHODES, JR
JEFF P. DEGRAFFENREID
JASON P. LACEY
KYLE J. STEADMAN
BROOKE BENNETT AZIERE
C. EDWARD WATSON, II
TERESA L. SHULDA
F. ROBERT SMITH
FRANCIS J. BAALMANN
CHARLES McCLELLAN
MATTHEW W. BISH
BRADLEY D. SERAFINE
JUSTAN R. SHINKLE
RACHEL WETTA

KYLE E. CALVIN
TRENT R.BYQUIST
DAVID L. FERGUSON
KELSEY N. FROBISHER
TRAVIS D. HANSON
ANNE M. HARRISON
CLAYTON J. KAISER
WESLEY J. KIMMEL
NATHAN W. MANNEBACH
ROBERT J. McFADDEN
PAIGE D. PIPPIN
A. NICOLE ROSE
SHARON E. RYE

**OF COUNSEL**
ROBERT L. HOWARD

**SPECIAL COUNSEL**
DAVID M. TRASTER
GORDON G. KIRSTEN, II
J. STEVEN MASSONI
CYD GILMAN

**KANSAS CITY**
JAMES D. OLIVER
VAUGHN BURKHOLDER
SCOTT C. PALECKI
SCOTT C. NEHRBASS
WENDELL F. (BUD) COWAN
ISSAKU YAMAASHI
TOBY CROUSE
TARA S. EBERLINE
JACK M. EPPS
MATTHEW D. STROMBERG
JOSHUA T. HILL
ANTHONY F. RUPP

DANIEL J. BULLER
DAVID R. GREEN
REBEKAH L. PINKSTON
ALEX W. SCHULTE
ERIC V. TURNER
AMANDA M. WILWERT

JOHN C. PECK
JEFFREY B. HURT

**TOPEKA**
JAMES P. RANKIN
THOMAS L. THEIS
CHARLES R. HAY
JEREMY L. GRABER

November 20, 2017

Ryan M. Peck
Will B. Wohlford
Law Offices of Morris Laing
300 N. Mead, Suite 200
Wichita, KS 67202-2745
rpeck@morrislaing.com
wwohlford@morrislaing.com

  Re:  Dr. Farmer vs. Stafford County Hospital

Dear Ryan and Will:

  Your client continues to act out in violation of the Temporary Restraining Order entered by Judge Melgren, and in violation of the Medical Staff Bylaws of Stafford County Hospital. Judge Melgren specifically included in his TRO that the hospital take no action against Dr. Farmer's privileges, yet this morning at 9:33 a.m., Jo Caley, Assistant Administrator, emailed Dr. Farmer and said,

> Your privileges for Medical Staff were needed for reappointment on 9-30-17. At the Medical Staff Meeting on November 14, 2017 you were granted the 90 day Temporary Privileges covering 9-30-17 to 12-30-17. When I receive your completed application I will continue the routine process of taking it to the Medical Staff Meeting.



Jo Caley had no authority to send that email; the Medical Staff had no authority to change Dr. Farmer's active member privileges to "temporary privileges," and her first sentence with the 9-30-17 reference is simply false. Further, Judge Melgren expressly said the hospital was not to

Page 2

take any action on Dr. Farmer's privileges at the meeting, I would say the ultra vires meeting, which was the subject of the TRO on November 14, 2017.

The other actions proposed for today (for which Dr. Farmer has received a number of emails from Jo Caley) are also unlawful. Jo Caley continues to send emails to Dr. Farmer without proper notice and without authority; and even the attachments are not downloadable by any known program, and the proposed amendments to the bylaws are not attached.

As a reminder, Dr. Farmer remains Chief of Staff, and none of the additions of medical staff or other actions purportedly taken by the hospital are lawful.

The proposed new members of the medical staff were never proposed to Dr. Farmer or vetted by him, in violation of Article IV - Member of the Professional Staff - C. Application for Appointment: 2. The application shall be presented to the Administrator who will acknowledge it and forward it to the Chief of Staff, who shall refer the application to the Credentials Committee at the next regular Staff meeting.

The proposed new members were never approved by a majority of lawful Active Staff members: 4. …the staff shall, by a majority vote of the total number of Active Staff members, recommend the application be accepted or rejected . . . .

Dr. Farmer has not approved additional allied health professionals: F. Allied Health Professionals – The Chief of Staff shall have the authority to approve the clinical privileges for Allied Health Professionals . . . .

Dr. Farmer has not approved additional temporary privileges for any of the proposed members of the medical staff: Article VI Temporary Privileges – 1. Temporary privileges may be granted to any licensed physician or dentist by the Administrator in conjunction with the Chief of Staff

Everything action taken recently by Dr. Carter and the hospital has been ultra vires, and without consulting with or obtaining the approval of Dr. Farmer: Article IX, B.: the Chief of staff presides at the meetings of the Staff; the Chief of Staff is the Chairman of the Executive Committee and a member of all other committees

None of the "special meetings" are lawful, as they have not been called by Dr. Farmer or properly noticed: Article XI, Section C. Special Meetings: called by the Chief of Staff: notice posted for at least 48 hours.

None of the meetings have been coordinated with Dr. Farmer: Article XIII Rules and Regulations: Meetings coordinated with Chief of Staff

Dr. Farmer disapproves of all of the purported actions of the purported medical staff, and objects to the meeting today and any purported actions taken at the meeting today.

Page 3

Dr. Carter and the administration of Stafford County hospital are acting unlawfully and are endangering the operations of the hospital and the health of the patients. Further, they are acting in breach of Judge Melgren's Temporary Restraining Order, and are subject to being held in contempt of Court.

By copy of this letter, I am asking Dr. Farmer to forward this letter to Jo Caley as his objection to all actions taken that have not been in consultation with Dr. Farmer or approved by Dr. Farmer.

Very truly yours,

FOULSTON SIEFKIN LLP

*/s/ Gary L. Ayers*

Gary L. Ayers

Cc:    Dr. Farmer

**Kaiser, Clayton**

| | |
|---|---|
| **From:** | Will Wohlford <WWOHLFORD@morrislaing.com> |
| **Sent:** | Monday, November 20, 2017 12:27 PM |
| **To:** | Ayers, Gary; Ryan Peck |
| **Cc:** | Kaiser, Clayton |
| **Subject:** | RE: Letter re: today's proposed Stafford Meeting in violation of TRO |
| **Attachments:** | 15 - 11.17.17 -Transcript of Motion for TRO Hearing.pdf |

Gary:

We' have reviewed your letter.  The hospital is not violating the TRO.  Initially, page 65 line 10-12 of the attached transcript enjoined the hospital from making any report or recommendation to the board of directors.  He did not state that the staff meetings to discuss those recommendations could not be held.  Because we have determined it is best to wait until after the injunction hearing on the 28th, however, this will not be addressed at any medical staff meeting until at least after the injunction hearing.  With respect to the temporary privileges issue, Dr. Farmer's privileges had lapsed as of 9-30-17, before he filed this lawsuit.  All that has been done is to clarify that he has temporary privileges until he can resubmit his paperwork for reappointment.  We are following the court order and will not act on any reappointment until after the injunction hearing and will do so per the court's orders.  Finally, the proposed amendments to the bylaws are prospective and would not apply to address the incidents concerning Dr. Farmer that are the subject of this lawsuit.  Nevertheless, to avoid confusing the matter, the staff will not vote on any bylaw changes until after the injunction hearing.

Your assertions that the TRO is being violated are incorrect, and we will address them at the injunction hearing if necessary.

Will B. Wohlford
Morris, Laing, Evans, Brock &
   Kennedy, Chartered
300 North Mead, Suite 200
Wichita, Kansas  67202
(316) 262-2671 - Telephone
(316) 262-5991 - Facsimile

**From:** Ayers, Gary [mailto:gayers@foulston.com]
**Sent:** Monday, November 20, 2017 10:12 AM
**To:** Ryan Peck <RPECK@morrislaing.com>
**Cc:** Will Wohlford <WWOHLFORD@morrislaing.com>; Kaiser, Clayton <CKaiser@foulston.com>
**Subject:** Letter re: today's proposed Stafford Meeting in violation of TRO

You client continues to violate the TRO. Please see attached.

Gary L. Ayers
Foulston Siefkin LLP
1551 N. Waterfront Pkwy., Ste. 100
Wichita, Kansas 67206-4466
316.291.9530 (direct dial)
316.267.6345 (general fax)



EXHIBIT

7

866.346.1938 (direct fax)
gayers@foulston.com (e-mail)
www.foulston.com (website)

**WRIGHT LAW OFFICE,**
**Chartered**

4312 10th St. Place
Great Bend, Kansas 67530
PH 620-793-8900
FX 620-793-8525
brian@bcwrightlaw.com

February 6, 2018

*Sent Via Email: gayers@foulston.com*
Gary L. Ayers
FOULSTON SIEFKIN, LLP
1551 N. Waterfront Pkwy #100
Wichita, Kansas  67206

RE:    Frederick Farmer, D.O.

Dear Gary:

I am enclosing a revised version of the Settlement Agreement. This now contains a set of conditions and agreements that reflects the agreement of all of the defendants. Please take note of it, discuss it with your client, and let me know if it is agreeable. If changes need to be suggested, we are open to restatements or technical changes, but the position of the parties is that the language contained in this Agreement is essential in setting forth the content and structure of that Agreement. The wording can be changed, but not the basic points of agreement. With that said, I believe it is completely consistent with the agreement in principle that you and I made when we agreed to continue the preliminary injunction hearing.

I apologize for the delay in getting this document to you.

We also have another issue to discuss. Several weeks ago, the hospital received a review back from a third-party reviewer (KFMC). The risk management matter was sent to KFMC on or about November 16, 2017. Like the earlier matters that were later reported to the KBHA, it was sent to KFMC so a neutral outside reviewer could assist with the risk management determination of the standard of care. I am told this chart had to be reviewed (pursuant to the risk management plan of the hospital) because it was an unexpected transfer of a patient who died.

Of course the hospital is now well-aware of what I call the "ambiguous" contents of the Temporary Restraining Order that was entered November 14. I say "ambiguous" because while the Order seems to prohibit the hospital from doing anything to impair the privileges *or the licensure* of Dr. Farmer, despite the hospital's unequivocal obligation under State law to follow its risk management plan, and not deviate from that plan. In this circumstance, the hospital did comply with the risk management plan, because it has done nothing that could affect the license of the doctor. I don't think it violated the spirit of the TRO, which was that the hospital was restrained from sending more reports to the KBHA. Indeed, with relation to this item, to this day, the hospital has taken no affirmative action to change the privileges or affect the licensure of Dr. Farmer. The current matter has not been turned into the State Board of Healing Arts, even though

**EXHIBIT**
**8**

there is a finding of SOC3. However, the chart was sent to Board Investigator Joe Tatrn, because he requested the materials related to this incident shortly after the Temporary Restraining Order was entered. The hospital strongly believes that providing materials to a Board Investigator is not only required under law, but cannot be prohibited by a Federal Court order; moreover, it isn't any activity that is designed to affect the licensure. It is a magisterial duty that can be fulfilled only by sending the records.

Moreover, the hospital made no specific decision that resulted in the submission of the matter to KFMC for risk management consideration. What it did was a matter of routine risk management activity in response to a complaint that was turned in by a provider with knowledge of the incident. It was turned in by a person who met the definition of "knowledge" as that term is used in the statutory provisions relating to risk management incident reporting. As I am sure you are aware, the obligations of a risk manager and risk management program often do not carry discretion. In this case, with a complaint made, again accounting (as had been done before) for Dr. Farmer's concern about the fairness to him of internal risk management investigative techniques, the matter was sent out. There was no intent to violate the TRO.

I want you to be aware of this so that there aren't any surprises later. Within 30 days of the receipt by the hospital of the KFMC report, a decision must be made whether to accept the outside reviewer's SOC determination. If that determination is accepted, the hospital is mandated to turn a report over to the Board.

For no other reason than the fact that the Federal Court is involved in the process, I am notifying you that Dr. Farmer is invited to present whatever information he wishes to present to the Risk Management Committee, to attend and participate in the Risk Management Committee meeting, and otherwise be fully heard in regard to this SOC3 finding before any decision is made to accept the outside reviewer's determination. This isn't required by the risk management plan, but is being offered so that your client will be afforded the opportunity the TRO could be interpreted to require.

I will provide you with more information when it is available to me. Thank you for your attention to the above and the enclosed.

Sincerely,

WRIGHT LAW OFFICE, Chartered

Brian C. Wright

BCW/rh
Enclosure
cc:    Todd Taylor
       Jo Caley
       Richard Carter, MD

**Kaiser, Clayton**

| | |
|---|---|
| **From:** | Ayers, Gary |
| **Sent:** | Monday, February 12, 2018 9:52 AM |
| **To:** | brian@bcwrightlaw.com |
| **Cc:** | Kaiser, Clayton |
| **Subject:** | Dr. Farmer vs. Stafford County Hospital et al |
| **Attachments:** | 2018-2-12 Dr. Farmer's Motion for Civil Contempt.pdf; 2018-2-12 Memorandum in Support of Civil Contempt Motion.pdf; 2018-02-12 GLA Letter to Wright-signed.pdf |

Brian, Please see attached correspondence, Motion in Contempt, and Memorandum in Support which I am planning to file on Wednesday if we cannot get this resolved. Gary

Gary L. Ayers
Foulston Siefkin LLP
1551 N. Waterfront Pkwy., Ste. 100
Wichita, Kansas 67206-4466
316.291.9530 (direct dial)
316.267.6345 (general fax)
866.346.1938 (direct fax)
gayers@foulston.com (e-mail)
www.foulston.com (website)



EXHIBIT
**9**